IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Yousif Abdullah Al-Rubaish, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil No.  05-cv-1714-RWR |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**MOTION FOR PRELIMINARY INJUNCTION REQUIRING RESPONDENTS
TO PROVIDE COUNSEL FOR PETITIONERS AND THE COURT WITH
30-DAYS' ADVANCE NOTICE OF ANY INTENDED
<u>REMOVAL OF PETITIONER FROM GUANTANAMO AND OTHER RELIEF</u>**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28

U.S.C. § 1651, Petitioners Yousif Abdullah Al-Rubaish, acting through his Next Friend,

Abdullah Saleh Al-Rubaish, move the Court to issue an order (1) requiring Respondents to

provide counsel for Petitioners and the Court with thirty days' advance notice of any intended

removal of Petitioner Yousif Abdullah Al-Rubaish from Guantánamo Bay Naval Base in Cuba;

(2) requiring Court approval before such transfer has first been obtained; and (3) allowing

expedited discovery if Respondents challenge any facts upon which this Motion is based.

Dated:  November __, 2005

Respectfully submitted,

Counsel for Petitioners:

_____

Michael Rapkin
Law Offices of Michael Rapkin
California State Bar No. 67220
1299 Ocean Avenue, Suite 900
Santa Monica, California  90401
Tel:  (310) 656-7880
Fax:  (310) 656-7883


*Of Counsel*
Barbara Olshansky (NY0057)
Tina Monshipour Foster (NY5556)
Gitanjali S. Gutierrez (NY1234)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Yousif Abdullah Al-Rubaish, *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| ) | Civil No.  05-cv-1714-RWR |
| v. ) | |
| ) | |
| GEORGE W. BUSH, *et al.*, ) | |
| ) | |
| Respondents. ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF PETITIONERS'
## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1651, Petitioner Yousif Abdullah Al-Rubaish, acting through his Next Friend, (collectively "Petitioners") hereby move this Court to preliminarily enjoin the Respondents and other agents of the United States Government from transferring or removing Petitioner Yousif Abdullah Al-Rubaish ("Petitioner Al-Rubaish") from United States custody at Guantánamo Bay, unless Petitioner's counsel has been furnished with thirty days' advance notice of such transfer or removal, and further unless and until leave of court for such transfer has first been obtained.

The Honorable Richard W. Roberts has previously granted this motion in at least three other cases:  *El-Banna, et al. v. Bush*, C.A. No. 04-1144, *Abdullah, et al. v. Bush*, C.A. No. 05-23, and *Al Rashedian et al. v. Bush*, C.A. No. 05-586.  A copy of the Court's Memorandum Order of April 8, 2005 for these three cases is attached hereto as <u>Exhibit "6"</u>.

Further, to the extent that the Respondents challenge any of the facts upon which this Motion is based, Petitioners ask that the Court order expedited discovery so as to provide the

Petitioners a full and fair opportunity to demonstrate their entitlement to the requested injunctive relief.

## Introduction

Petitioner Al-Rubaish, a Saudi Arabian national, has been held *incommunicado* for almost four years without trial or charges. He now seeks to exercise what may be his only real avenue to regain his freedom and to demonstrate that he is not an "enemy combatant" or terrorist. As the United States Government has made plain in its conduct in similar litigation, however, the President has asserted a unilateral right to dispose of this foreign citizen as he sees fit, and there appear to be few boundaries that the Government will not cross. In this motion, the Petitioners ask only that the status quo be maintained while this lawsuit is pending, and that the Government be prohibited from transferring Petitioner Al-Rubaish to Saudi Arabia, where he is at significant risk of being tortured, as have many others in Saudi custody, or to any other location from which the Petitioners would be precluded from pursuing these claims, and/or at which Petitioner Al-Rubaish's safety might be compromised.

The irreparable harm to this individual from being subjected to torture and from losing what may be his only real avenue of appeal cannot possibly be overstated. On the other hand, the United States Government has seen fit to detain Petitioner Al-Rubaish for almost four years at Guantánamo Bay, and cannot possibly demonstrate harm if it is prevented from now transferring him into the custody of another foreign state. For the reasons described more fully below, Petitioners are entitled to a preliminary injunction preventing any such transfer.

## Statement of Facts

Petitioner Al-Rubaish is being detained as an "enemy combatant" at Guantánamo Bay Naval Base in Cuba. He denies that he is an enemy combatant and he contends he is being detained in violation of the Constitution, treaties and laws of the United States. His petition for

2

habeas relief was filed on August 26, 2005. The Pentagon, with the assistance of the State Department, has planned to transfer hundreds of Guantánamo detainees to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials. *See:* Douglas Jehl, *Pentagon Seeks to Transfer More Detainees From Base in Cuba*, NY Times, Mar. 11, 2005, at A1; *U.S. Plans to Reduce Guantanamo Inmates*, Reuters-NY Times, March 11, 2005 (Exhibit "1" hereto).

Upon information and belief, the United States has secretly transferred detainees and terrorist suspects to other countries for interrogation without complying with extradition or other legal procedures. Detainees are "rendered" to other countries where torture is routinely practiced. This practice, known as "rendition", "irregular rendition" or "extraordinary rendition" is used to facilitate interrogation by subjecting detainees to torture.

It has been documented by various major, American and international news organizations, including, *inter alia*, The Washington Post, The L.A. Times and the British Broadcasting Corporation (the "BBC"), that the United States Government has repeatedly transferred detainees such as Petitioner Al-Rubaish into the custody of foreign governments that engage in torture, including Saudi Arabia. As stated in *The Washington Post* nearly three years ago:

> Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries… whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

Rajiv Chanrasekaran and Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, WASH. POST, Mar. 11, 2002, at A1; *see also* Dana Priest and Barton Gellman, *U.S. Decries Abuse But Defends Interrogations,* WASH. POST, Dec. 26, 2002), at A1. These "renditions" are based upon

agreements between the United States and foreign governments, such as Saudi Arabia, "that agree to have local security services hold certain terror suspects in their facilities for interrogation by CIA and foreign liaison officers."  Dana Priest, *Long-Term Plan Sought for Terror Suspects,* WASH. POST, Jan. 2, 2005, at A1.

Saudi Arabia appears to have been a particularly popular target venue for renditions, notwithstanding Saudi Arabia's miserable record of human rights violations.  *See, e.g.:* Douglas Jehl and David Johnston, *Rule Change Lets C.I.A. Freely Send Suspects Abroad to Jails,* NY Times, March 6, 2005, at A1. "…former government officials say that since the Sept. 11 attacks, the C.I.A. has flown 100 to 150 suspected terrorists from one foreign country to another, including to Egypt, Syria, Saudi Arabia, Jordan and Pakistan.  Each of those countries has been identified by the State Department as habitually using torture in its prisons."  (Exhibit "2" hereto.)

Another judge of this Court found the allegations of Omar Abu Ali – an American citizen claiming that he was detained and tortured in Saudi Arabia at the direction of the United States – were sufficiently credible to warrant jurisdictional discovery.  *See Ali v. Ashcroft,* No. 04-1258 (JDB), 2004 U.S. Dist. LEXIS 25239 at *122 (D.D.C. Dec. 16, 2004).  Faced with the prospect of such discovery, the United States has acted to moot Ali's habeas case by returning him to the United States to face criminal proceedings.  *See* Affidavit of Brian Evans, dated 9/17/04, filed as an exhibit of the Petition For Habeas Corpus in *Omar Abu Ali, et al. v. Ashcroft,* No. 1:04-cv-01258 (JDB) (D.D.C. 2004) (Exhibit "3" hereto).

One report, using U.S. officials as its source, demonstrates that in recent years U.S. agents, working with foreign intelligence services and local authorities, have sent dozens of suspected Islamic extremists abroad or taken them to the United States. *See* Human Rights Watch, *The Road to Abu Ghraib:  I. A Policy to Evade International Law,* June 2004, *at*

4

www.hrw.org/reports/2004/usa0604 ("The Bush administration facilitated or participated directly in the transfer of an unknown number of persons without extradition proceedings, a practice known as 'irregular rendition,' to countries in the Middle East known to practice torture routinely.") (Exhibit "5" hereto, filed in *John Does 1-570 v. George W. Bush, et al.*, No. 01-05cv00313 (C.K.K.) (D.D.C. March __, 2005)); Megan K. Stack and Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture*, L.A. TIMES, Jan. 13, 2005, at A1 (stating that "[n]ews accounts, congressional testimony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations where, according to State Department reports, torture has been widely used on prisoners").

These reports about the Saudi government's torture of detainees come as no surprise to Respondents. As Respondents are well aware, the United States Department of State has consistently identified Saudi Arabia as a practitioner of official, state-sponsored torture.

On November 2, 2005, the *Washington Post* reported that for almost four years, the CIA has been operating a "covert prison system" of overseas detention facilities – called "black sites" – while "keeping even basic information about the system secret from the public, foreign officials and nearly all members of Congress charged with overseeing the CIA's covert actions." Dana Priest, "CIA Holds Terror Suspects in Secret Prisons", *Wash. Post*, Nov. 2, 2005, at A1. Government intelligence officials reportedly defend the black sites because they provide the CIA with locations to "hold and interrogate suspected terrorists for as long as necessary and without restrictions imposed by the U.S. legal system or even by the military tribunals established for prisoners held at Guantanamo Bay." *Id.* According to the *Washington Post*, interrogators at the black sites "are permitted to use the CIA's approved 'Enhanced Interrogation Techniques', some of which are prohibited by the U.N. convention [against torture and other cruel, inhuman or

degrading treatment or punishment] and by U.S. military law," including "waterboarding", *i.e.*, inducing a prisoner to believe he is drowning. *Id.* The German newspaper *Spiedel* reported that "Czech Interior Minister František Bublan admitted American intelligence officials asked a month ago if several people could be flow[n] in from Guantanamo Bay in Cuba for 'secure asylum,' but Prague turned down the request." "The CIA's 'Black Sites': Guantanamos in Europe?", *Spiegel Online*, Nov. 7, 2005, service.Spiegel.de/cache/international/ 0,1518,druck-383670,00.html.

The concerns that Petitioner Al-Rubaish might be rendered to Saudi Arabia in the near future are not merely theoretical ones. Judge Roberts already noted that Petitioner's concern about transfer to another country with a history of torturing prisoners is not merely "fanciful". *El-Banna v. Bush*, No. 04-1144 (RWR), at p. 4 (April 8, 2003). Petitioners' concerns are real, bolstered by the fact that mere threats of rendition to Saudi Arabia seem to have been a particularly terrifying tool in the torturer's armory used by American Interrogators at Guantánamo Bay and elsewhere. For example, one released detainee, Australian citizen Mamdouh Habib, was sent to Egypt, where he spent six months in Egyptian custody. During his incarceration in Egypt, the only time he left his cell was for interrogations. His Egyptian interrogators came for him at unpredictable times – sometimes in the middle of the night, sometimes during the day. During these sessions, beatings were routine.

> Mr. Habib, always handcuffed and sometimes suspended from hooks on the wall, was kicked, punched, beaten with a stick, and rammed with what can only be described as an electric cattle prod. If he lapsed into unconsciousness, they would revive him and continue the beatings. If they discontinued the 'interrogations' and Mr. Habib fell asleep on the floor, they would douse him with cold water or kick him in his ribs and start again.

Following months of torture and interrogation, Mr. Habib was transferred from Egypt, first to Bagram Air Force Base and then to Guantánamo Bay. Upon learning that Egypt was

again seeking his return to Egypt, Mr. Habib sought – through counsel – a Temporary Restraining Order to avoid being rendered back to Egypt.

The U.S. government itself recognizes the danger to those detained in Saudi Arabia, saying the following in its August 2005 Background Note on Saudi Arabia:

> Despite close cooperation on security issues, the United States remains concerned about human rights conditions in Saudi Arabia. *Principal human rights problems include abuse of prisoners and incommunicado detention.*

(U.S. Department of State, *Background Note: Saudi Arabia*, http://www.state.gov/r/pa/ei/bgn/ 3584.htm) (emphasis added). In its 2003 Country Report on Human Rights Practices in Saudi Arabia, the State Department stated:

> [T]here were credible reports that the authorities abused detainees, both citizens and foreigners. Ministry of Interior officials were responsible for most incidents of abuse of prisoners, including beatings, whippings, and sleep deprivation. In addition, there were allegations of torture, including allegations of beatings with sticks and suspension from bars by handcuffs. There were reports that torture and abuse were used to obtain confessions from prisoners.

(U.S. Department of State, *Country Reports on Human Rights Practices 2003: Saudi Arabia*, http://www.state.gov/g/drl/rls/hrrpt/2003/27937.htm.) In 2005, the State Department reiterated its concern about Saudi torture and abuse of prisoners and added that:

> During [2004], the Mutawwa'in [religious police] harassed, abused, and detained citizens and foreigners of both sexes . . . Mutawwa'in abuses continued during the year, despite an initial decrease following the May 2003 terrorist attacks.

(U.S. Department of State, *Country Reports on Human Rights Practices 2004: Saudi Arabia*, http://www.state.gov/g/drl/rls/hrrpt/2004/41731.htm.)[1]

The Government might claim that it has no present plans to transfer Petitioner Al-Rubaish or other alleged enemy combatants at Guantánamo. This claim, however, does not moot the relief requested by Petitioners, which is that Respondents be compelled to notify them should

---

[1] Amnesty International has reported that "[f]ive Saudi Arabian nationals returned to Saudi Arabia from Guantanamo Bay [in 2003] were locked up upon arrival and their legal status remain[ed] shrouded in secrecy" one year later. Amnesty International USA, "The Gulf and the Arabian Peninsula: Human rights fall victim to the 'War on Terror'", at 14, June 21, 2004, www.amnestyusa.org/countries/saudi_arabia/document.do?id.

their plans change.  Because the Government will not commit to maintain the current policy, and will not commit to timely notification of a change in policy, an injunction is required.

### Argument

## I.    PETITIONERS ARE ENTITLED TO A PRELIMINARY INJUNCTION TO PREVENT PETITIONER AL-RUBAISH'S TRANSFER AND TO MAINTAIN THE STATUS QUO.

The Petitioners ask that the Respondents be enjoined from carrying out on any threats of "rendering" or from undertaking any attempt to place Petitioner Al-Rubaish outside of the jurisdiction of this Court.  This Court has the inherent power, under the All Writs Act, 28 U.S.C. § 1651(a) "to issue injunctions to protect its jurisdiction."  *Securities Exchange Comm'n v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Environmental Defense Fund v. Environmental Protection Agency*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973) (citing All Writs Act for the proposition that the appellate court had inherent power to issue an injunction binding non-parties to protect its jurisdiction over appeal).  Petitioners' request meets the most fundamental purpose of preliminary injunctive relief:  "to preserve the status quo between the parties pending a final determination of the merits of the action."  13 MOORE'S FEDERAL PRACTICE 3D § 65.20 (2004) (stating that "a request for preliminary injunction that seeks to restore the status quo will ordinarily be granted").[2]

It is submitted that the rendering of Petitioner Al-Rubaish to other countries for torture and interrogation would violate the International Covenant on Civil and Political Rights, the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment and Third and Fourth Geneva Conventions.  This Court has jurisdiction to address torts committed in

---

[2]This request for preliminary injunctive relief is not in any way a concession that Petitioner is properly held in detention at Guantánamo Bay by the Respondents.  Rather, Petitioners ask only that they not be deprived of the opportunity to challenge that confinement by being transferred into the custody of a foreign nation, thereby subject to further detention or worse.  Petitioners also do not concede that such a transfer would *necessarily* deprive this Court of jurisdiction.  It would, however, make it at a minimum far more difficult for Petitioners to exercise their rights.

violation of those treaties pursuant to Federal Alien Tort Act, 28 U.S.C. § 1350, and this Court

may be the only fair forum in which such claims may be adjudicated.

Each of the four factors to be weighed in awarding preliminary injunctive relief favors

the requested injunction here: (1) The Petitioner will suffer irreparable harm if the injunction is

denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) the

Petitioners are likely to succeed on the merits of their claims; and (4) there is a clear public

interest in preventing the United States Government from rendering individuals to foreign

countries for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir.

2001); *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova*

*Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

With respect to the balance of harms, that balance could not be more clear. Petitioner Al-

Rubaish stands to suffer immeasurable, let alone irreparable, harm from being subject to torture

and possible death at the hands of a foreign government notorious for such torture and from the

loss of his only fair forum to adjudicate their detention. It is indisputable that the Respondents

have and plan to remove prisoners from Guantánamo. *See* Exhibit "4", for example, D.O.D.

Press Release No. 249-05 dated March 12, 2005. By contrast, the Respondents, who have

already held Petitioner Al-Rubaish *incommunicado* for more than three and one-half years, are

asked only to provide counsel and the Court with adequate notice (30 days) of any intended

removal of Petitioner Al-Rubaish from Guantánamo. The Respondents can suffer no

conceivable harm from complying with such a request.

In considering the likelihood of success of Petitioners' claims in this case, the Court need

only refer to Fed.R.App. p.23(a), which requires that "pending review of a decision in a habeas

corpus proceeding commenced before a court . . . the person having custody of the prisoner must

not transfer custody to another unless a transfer is directed in accordance with the rule." The

Rule "was designed to prevent prison officials from impeding a prisoner's attempt to obtain habeas corpus relief by physically removing the prisoner from the territorial jurisdiction of the Court in which a habeas corpus petition is pending." *Hammer v. Meachum*, 691 F.2d 958, 961 (10th Cir. 1982). The removal of this Petitioner to another country would in all likelihood deprive the Court of its jurisdiction.

It is further urged that the Petitioners have presented substantial claims that challenge conduct of the United States Government in violation of even the most basic international norms, as well as the United States laws governing habeas corpus.[3] *See Rasul v. Bush*, 524 U.S. ___, ___ n.15, 124 S.Ct. 2686, 2698 n.15 (2004) (stating that "Petitioners' allegations that, although they have engaged neither in combat nor in acts of terrorism . . . they have been held in Executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing–unquestionably described 'custody in violation of the Constitution or laws or treaties of the United States.'") (citing 28 U.S.C. §2241(c)(3).[4] The rendering of Petitioner to Saudi Arabia or another country for torture and interrogation would violate the International Covenant on Civil and Political Rights, the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment, and the Third and Fourth Geneva Conventions. This Court has jurisdiction to address torts committed in violation of those treaties pursuant to the Federal Alien Tort Act, 28 U.SC. §1350.

---

[3] Given the severe harm to Petitioners from being rendered and the lack of any harm to the Respondents if rendering does not occur, these very strong factors alone should override any attempt by the Respondents to claim that Petitioners' claims are insubstantial. *See Cityfed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

[4] Indeed, as the former United States Secretary of State, Colin L. Powell, acknowledged, the Respondents' public position that the Geneva Convention on the Treatment of Prisoners of War does not apply to detainees like Petitioners "deprives [Respondents] of a winning argument to oppose *habeas corpus* actions in the United States." *See* Memorandum To Counsel for the President, Assistant to the President for National Security Affairs from Colin L. Powell, *reprinted in* Mark Danner, TORTURE AND TRUTH: AMERICA, ABU GHRAIB, AND THE WAR ON TERROR 88-91 (2004).

Finally, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioner from the Court's jurisdiction.  No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant, properly before the Court and represented by counsel, be provided with a meaningful opportunity to contest his transfer into the hands of those who might torture him and/or detain him indefinitely.  The United States Government has seen fit to detain him for more than three and one-half years without trial, without counsel, and without charges.  This is wrong!  Instead, strong public interest is to ensure that its laws do not subject individuals to indefinite detention without due process.  "It is always in the public interest to prevent the violation of a party's constitutional rights."  *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

## II. THE COURT SHOULD ORDER EXPEDITED DISCOVERY TO ALLOW PETITIONERS TO PRESENT EVIDENCE IN SUPPORT OF THE REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF.

As stated above, Petitioner Al-Rubaish has been held *incommunicado* for almost four years.  No attorney, including the undersigned counsel, has thus far been able to meet with him or to collect evidence from him, or from others.  Nor have Petitioners had the opportunity to engage in discovery that would demonstrate the United States' knowledge of and acquiescence in Saudi torture practices, and the Respondents' threats (through their agents) to deport individuals such as Petitioner Al-Rubaish to Saudi Arabia.  A party who seeks a preliminary injunction is entitled to a fair opportunity for a hearing and to present evidence.  *See* 13 MOORES' FEDERAL PRACTICE 3D  § 65.21(3) & n.10 (2004).  The Federal courts have broad power to coordinate discovery in civil cases.  *See Federal Rules of Civil Procedure,* Rule 26(b)(1) (stating that "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action"); *see also* 28 U.S.C. § 2246 (stating, in *habeas* cases, that the court may,

11

in its discretion, take evidence in the form of oral testimony, deposition, or affidavit, in addition to documentary evidence).[5]  Accordingly, to the extent that the Respondents challenge any of the facts upon which this motion is based, Petitioners request that the Court allow Petitioners to engage in discovery in support of their request for a preliminary injunction.

**Conclusion**

For the reasons discussed above, this motion should be granted.


Dated:  November __, 2005                  Respectfully submitted,

                                           Counsel for Petitioners:


                                           _____
                                           Michael Rapkin
                                           Law Offices of Michael Rapkin
                                           California State Bar No. 67220
                                           1299 Ocean Avenue, Suite 900
                                           Santa Monica, California  90401
                                           Tel:  (310) 656-7880
                                           Fax:  (310) 656-7883


                                           *Of Counsel*
                                           Barbara Olshansky (NY0057)
                                           Tina Monshipour Foster (NY5556)
                                           Gitanjali S. Gutierrez (NY1234)
                                           CENTER FOR CONSTITUTIONAL RIGHTS
                                           666 Broadway, 7th Floor
                                           New York, New York 10012
                                           Tel: (212) 614-6439
                                           Fax: (212) 614-6499

---

[5] The undersigned counsel are aware that it will be necessary to obtain security clearances in order to engage in a meaningful discovery process, are currently awaiting to receive security clearance, and stand ready to begin that process as soon as the Government supplies them with the necessary documentation.

**EXHIBIT "1"**

A true copy — retyping was required to correct errors caused by electronic scanning of the document

## EXHIBIT "1"

**March 11, 2005**
Pentagon Seeks to Transfer More Detainees From Base in Cuba
By DOUGLAS JEHL

WASHINGTON, March 10 . The Pentagon is seeking to enlist help from the State Department and other agencies in a plan to cut by more than half the population at its detention facility in Guantánamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials.

The transfers would be similar to the renditions, or transfers of captives to other countries, carried out by the Central Intelligence Agency, but are subject to stricter approval within the government, and face potential opposition from the C.I.A. as well as the State and Justice Departments, the officials said.

Administration officials say those agencies have resisted some previous handovers, out of concern that transferring the prisoners to foreign governments could harm American security or subject the prisoners to mistreatment.

A Feb. 5 memorandum from Defense Secretary Donald H. Rumsfeld calls for broader interagency support for the plan, starting with efforts to work out a significant transfer of prisoners to Afghanistan, the officials said. The proposal is part of a Pentagon effort to cut a Guantánamo population that stands at about 540 detainees by releasing some outright and by transferring others for continued detention elsewhere.

The proposal comes as the Bush administration reviews the future of the naval base at Guantánamo as a detention center, after court decisions and shifts in public opinion have raised legal and political questions about the use of the facility.

The White House first embraced using Guantánamo as a holding place for terrorism suspects taken in Afghanistan, in part because the base was seen as beyond the jurisdiction of United States law. But recent court rulings have held that prisoners there may challenge their detentions in federal court.

Indeed, the Pentagon has halted, for the last six months, the flow of new terrorism suspects into the prison, Defense Department officials said. In January, a senior American official said in an interview that most prisoners at Guantánamo no longer had any intelligence value and were not being regularly interrogated.

The proposed transfers would represent a major acceleration of Pentagon efforts that have transferred 65 prisoners from Guantánamo to foreign countries. The population at Guantanamo includes more than 100 prisoners each from Afghanistan, Saudi Arabia and Yemen, a senior administration official said, and the United States might need to provide money or other logistical support to make possible a large-scale transfer to any of those nations.

Defense Department officials said that the adverse court rulings had contributed to their determination to reduce the population at Guantánamo, in part by persuading other countries to bear some of the burden of detaining

3/11/2005

Exodus? (10004-00266)                                        Page 2

terrorism suspects.

Under the administration's approach, the State Department is responsible for negotiating agreements in which receiving countries agree "to detain, investigate, and/or prosecute" the prisoners and to treat them humanely.

"Our top choice would be to win the war on terrorism and declare an end to it and repatriate everybody," a senior Defense Department official said in an interview. "The next best solution would be to work with the home governments of the detainees in order to get them to take the necessary steps to mitigate the threat these individuals pose.

The official, who spoke on condition of anonymity, said that future transfers into Guantánamo remained a possibility," but made clear that the court decisions and the burdens of detaining prisoners at the American facility had made it seem less attractive to administration policymakers than before.

"It's fair to say that the calculus now is different than it was before, because the legal landscape has changed and those are factors that might be considered," a senior Defense Department official said.

In addition to working to transfer prisoners to their home countries, either to face charges there or simply to be kept in detention, officials also hope to shed dozens of prisoners whose cases are being studied by special review boards.

Those three-member military boards began working in earnest in January to determine which prisoners are no longer a threat, have no information of value and may be released outright.

At its peak, the population at Guantánamo exceeded 750 prisoners. But the last time prisoners were transferred there was on Sept. 22, 2004, when a group of 10 was transferred from Afghanistan. The United States has already dispatched 211 Guantanamo prisoners, releasing the majority of them. Sixty-five have been transferred to the custody of other counties, including 29 to Pakistan, 5 to Morocco, 7 to France, 7 to Russia, and 4 to Saudi Arabia.

The administration's policy of detaining suspected terrorists at Guantánamo has relied on declarations that the detainees are unlawful "enemy combatants," based on assertions that they did not serve in a conventional army, and thus did not qualify for the protections listed in the Geneva Conventions.

Administration lawyers argued successfully in lower federal courts that United States laws, including access to the courts, did not apply because Guantánamo is part of Cuba.

But last June, the Supreme Court ruled that United States law applied to Guantánamo and that prisoners there could challenge their detentions in federal courts.

In August, a federal district judge ruled that the Geneva Conventions apply to Guantánamo prisoners and that the special military commissions to try war crimes were unconstitutional. The government's appeal of that ruling is scheduled to be heard next month.

Even as it moves to reduce the population at Guantánamo, the Pentagon has asked Congress for another $41 million in supplemental financing for construction there, including $36 million for a new, more modem prison and $5 million for a new perimeter fence.

The purpose, Defense Department officials said, was to provide a secure, humane detention facility for a remnant of the current population who are expected to remain there for the foreseeable future.

As many as 200 of those now at Guantánamo will most likely remain there indefinitely. the officials said. on grounds that they are too dangerous to be turned over to other- nations or would probably face mistreatment if returned to those nations.

Each of the roughly 540 prisoners at Guantánamo have gone before a three-member military board, to have their

*3/11/2005*

Exodus? (10004-00266)

status as enemy combatants reviewed. A final review has been completed in 487 cases; of those, all but 22 were found to have been properly classified, a status leaving them subject to possible war crimes charges.

Unlike the Pentagon, the C.I.A. was authorized by President Bush after the Sept. 11 attacks to transfer prisoners from one foreign country to another without case-by-case approval from other government departments. Former intelligence officials said that the C.I.A. has carried out 100 to 150 such transfers, known as renditions, since Sept.11.

By contrast, the transfers carried out by the Pentagon are subject to strict rules requiring interagency approval. Officials said that the transfers do not constitute renditions under the Pentagon's definition, because the governments that accept the prisoners are not expected to carry out the will of the United States.

Indeed, officials have been concerned that transfer of some detainees could threaten American security because they might escape from foreign prisons or the foreign governments might free them.

The White House has said its policy prohibits the transfer of prisoners to other nations if it is likely they will be tortured, and administration officials said the interagency review is intended in part to enforce that standard. Transfers have been approved by the State Department to countries including Saudi Arabia and Pakistan, identified in the department's own human rights reports as nations where the use of torture in prisons is common.

Administration officials said that American diplomats in those countries were responsible for monitoring agreements to make sure prisoners were not mistreated. The senior Defense Department official said that the difficulty of "gaining effective and credible assurances" that prisoners would not be mistreated had been "a cause of some delay in releasing or transferring some detainees we have at Guantánamo."

It is possible that Guantánamo inmates could petition a federal court to stop a transfer to a country where they did not want to be sent. But there is little if any precedent to suggest how the courts would rule.

In November, a lawyer for Mamdouh Habib, a prisoner who claimed he had been tortured in Egypt before being transferred to Guantanamo, asked a federal district court to stop the Bush administration from returning him to Egypt. Before the court ruled, he was sent to Australia in January and freed.

Neil A. Lewis and Tim Golden contributed reporting for this article.

Copyright 2005 The New York Times Company I Home I Privacy Policy I Search I Corrections I RSS I Help I Back to Top

A true copy — retyping was required to correct errors caused by electronic scanning of the document

Reuters News Article                                                    Page 1 of 2

## Exhibit 1A

# REUTERS
KNOW NOW

Print this article                                                      Close This Window

## U.S. Plans to Reduce Guantanamo Inmates — NY Times Fri Mar 11 20050104 AM ET

NEW YORK (Reuters) . The Pentagon is seeking to cut by more than half the number of detainees at its prison camp In Guantanamo Bay. Cuba, where the United States has been accused of abusing and torturing inmates. The New York Times reported on Friday.

The Pentagon aims to transfer hundreds of detainees to prisons In Saudi Arabia, Afghanistan and Yemen and is seeking support from other federal agencies to facilitate the planned moves the newspaper said, citing senior administration officials.

A Pentagon spokeswoman had no immediate comment.

The United States tins faced international criticism for its treatment of the Guantanamo prisoners. FBI memos made public recently accused Pentagon interrogators of using torture technkiues.' The U.S. rriltaty in January launched an internal Investigation Into allegations that Guantanamo inmates had been abused and tortured.

The Guantanamo Bay prison camp holds about 540 suspected ml Qaeda and Taliben prisoners. That numbers Includes more than 100 each from Afghanistan. Saudi Arabia and Yemen. a senior administration official was cited as saying.

The Pentagon said on March 7 that 211 prisoners had left the prison.

Nearly all of he detainees are being held without charges and some have been imprisoned there for more than three years. The United States has designated them 'enemy combatants' and denied them prisoner of war status, which brings certain rights under international law.

Defense Secretary Donald Rumsfeld, ins Feb. 5 memorandum, called for broader Interagency support of prisoner transfetu as port of a proposal to reduce the Guantanamo Bay prison camp population, the newspaper reported.

The New York Times quoted administration officials as saying that the transfers would be similar to the CIA transfers of captives to other countries, but were subject to stricter approval within the government.

The officials said the Pentagon plan could face opposition from the CIA, the State Department and the Justice Department, according to the report.

Those agencies have resisted previous transfers because of security concerns and the prospect that prisoners might be mistreated, the newspaper said.

According to the newspaper, Defense Department officials conceded that a series of adverse court rulings on detainee rights waso factor In their proposal to reduce the number of inmates at C3uantanarno in part by persuading other countries to take some of them.
'Our top choice would be to win the war on terrorism and declare an end to it and repatriate everybody,' a senior Defense Department official told The New York Times.

'The next best solution would be to work with th, home governments of the detainees in order to get them to take the necessary steps to mitigate the threat these individuals pose.'

All right, reserved. Users may download ý print ex'xacb of ~flqfl front this webhlte far their own personal and non-commercial use only. Republication or redistribution of Reuters content, hiduding by framing or similar means, Is expresely prohibited without the prior written consent of Reuters. Reuters and the Reuters sphere logo we registered trademarks or trademulcs of the Reuters group of companies around the world.

O Reuters 2006

**EXHIBIT "2"**

A true copy – retyping was required to correct errors caused by electronic scanning of the document

EXHIBIT "2"

## March 6, 2005

## A. Rule Change Lets C.I.A. Freely Send Suspects Abroad to Jails

By <u>DOUGLAS JEHL</u> and DAVID JOHNSTON

WASHINGTON, March 5 - The Bush administration's secret program to transfer suspected terrorists to foreign countries for interrogation has been carried out by the Central Intelligence Agency under broad authority that has allowed it to act without case-by-case approval from the White House or the State or Justice Departments, according to current and former government officials.

The unusually expansive authority for the C.I.A. to operate independently was provided by the White House under a still-classified directive signed by President Bush within days of the Sept. 11, 2001, attacks at the World Trade Center and the Pentagon, the officials said.

The process, known as rendition, has been central in the government's efforts to disrupt terrorism, but has been bitterly criticized by human rights groups on grounds that the practice has violated the Bush administration's public pledge to provide safeguards against torture.

In providing a detailed description of the program, a senior United States official said that it had been aimed only at those suspected of knowing about terrorist operations, and emphasized that the C.I.A. had gone to great lengths to ensure that they were detained under humane conditions and not tortured.

The official would not discuss any legal directive under which the agency operated, but said that the "C.I.A. has existing authorities to lawfully conduct these operations."

The official declined to be named but agreed to discuss the program to rebut the assertions that the United States used the program to secretly send people to other countries for the purpose of torture. The transfers were portrayed as an alternative to what American officials have said is the costly, manpower-intensive process of housing them in the United States or in American-run facilities in other countries.

In recent weeks, several former detainees have described being subjected to coercive interrogation techniques and brutal treatment during months spent in detention under the program in Egypt and other countries. The official would not discuss specific cases, but did not dispute that there had been instances in which prisoners were mistreated. The official said none had died.

The official said the C.I.A.'s inspector general was reviewing the rendition program as one of at least a half-dozen inquiries within the agency of possible misconduct involving the detention, interrogation and rendition of suspected terrorists.

13

In public, the Bush administration has refused to confirm that the rendition program exists, saying only in response to questions about it that the United States did not hand over people to face torture. The official refused to say how many prisoners had been transferred as part of the program. But former government officials say that since the Sept. 11 attacks, the C.I.A. has flown 100 to 150 suspected terrorists from one foreign country to another, including to Egypt, Syria, Saudi Arabia, Jordan and Pakistan.

Each of those countries has been identified by the State Department as habitually using torture in its prisons. But the official said that guidelines enforced within the C.I.A. require that no transfer take place before the receiving country provides assurances that the prisoner will be treated humanely, and that United States personnel are assigned to monitor compliance.

"We get assurances, we check on those assurances, and we double-check on these assurances to make sure that people are being handled properly in respect to human rights," the official said. The official said that compliance had been "very high" but added, "Nothing is 100 percent unless we're sitting there staring at them 24 hours a day."

It has long been known that the C.I.A. has held a small group of high-ranking leaders of Al Qaeda in secret sites overseas, and that the United States military continues to detain hundreds of suspected terrorists at Guantánamo Bay, Cuba, and in Afghanistan. The rendition program was intended to augment those operations, according to former government officials, by allowing the United States to gain intelligence from the interrogations of the prisoners, most of whom were sent to their countries of birth or citizenship.

Before Sept. 11, the C.I.A. had been authorized by presidential directives to carry out renditions, but under much more restrictive rules. In most instances in the past, the transfers of individual prisoners required review and approval by interagency groups led by the White House, and were usually authorized to bring prisoners to the United States or to other countries to face criminal charges.

As part of its broad new latitude, current and former government officials say, the C.I.A. has been authorized to transfer prisoners to other countries solely for the purpose of detention and interrogation.

The covert transfers by the C.I.A. have faced sharp criticism, in part because of the accounts provided by former prisoners who say they were beaten, shackled, humiliated, subjected to electric shocks, and otherwise mistreated during their long detention in foreign prisons before being released without being charged. Those accounts include cases like the following:

¶Maher Arar, a Syrian-born Canadian, who was detained at Kennedy Airport two weeks after the Sept. 11 attacks and transported to Syria, where he said he was subjected to beatings. A year later he was released without being charged with any crime.

¶Khaled el-Masri, a Lebanese-born German who was pulled from a bus on the Serbia-Macedonia border in December 2003 and flown to Afghanistan, where he said he was beaten and drugged. He was released five months later without being charged with a crime.

¶Mamdouh Habib, an Egyptian-born Australian who was arrested in Pakistan several weeks after the 2001 attacks. He was moved to Egypt, Afghanistan and finally Guantánamo. During his

14

detention, Mr. Habib said he was beaten, humiliated and subjected to electric shocks. He was released after 40 months without being charged.

In the most explicit statement of the administration's policies, Alberto R. Gonzales, then the White House counsel, said in written Congressional testimony in January that "the policy of the United States is not to transfer individuals to countries where we believe they likely will be tortured, whether those individuals are being transferred from inside or outside the United States." Mr. Gonzales said then that he was "not aware of anyone in the executive branch authorizing any transfer of a detainee in violation of that policy."

Administration officials have said that approach is consistent with American obligations under the Convention Against Torture, the international agreement that bars signatories from engaging in extreme interrogation techniques. But in interviews, a half-dozen current and former government officials said they believed that, in practice, the administration's approach may have involved turning a blind eye to torture. One former senior government official who was assured that no one was being mistreated said that accumulation of abuse accounts was disturbing. "I really wonder what they were doing, and I am no longer sure what I believe," said the official, who was briefed periodically about the rendition program.

In Congressional testimony last month, the director of central intelligence, Porter J. Goss, acknowledged that the United States had only a limited capacity to enforce promises that detainees would be treated humanely. "We have a responsibility of trying to ensure that they are properly treated, and we try and do the best we can to guarantee that," Mr. Goss said of the prisoners that the United States had transferred to the custody of other countries. "But of course once they're out of our control, there's only so much we can do. But we do have an accountability program for those situations."

The practice of transporting a prisoner from one country to another, without formal extradition proceedings, has been used by the government for years. George J. Tenet, the former director of central intelligence, has testified that there were 70 cases before the Sept. 11 attacks, authorized by the White House. About 20 of those cases involved people brought to the United States to stand trial under informal arrangements with the country in which the suspects were captured.

Since Sept. 11, however, it has been used much more widely and has had more expansive guidelines, because of the broad authorizations that the White House has granted to the C.I.A. under legal opinions and a series of amendments to Presidential Decision Directives that remain classified. The officials said that most of the people subject to rendition were regarded by counterterrorism experts as less significant than people held under direct American control, including the estimated three dozen high ranking operatives of Al Qaeda who are confined at secret sites around the world.

The Pentagon has also transferred some prisoners to foreign custody, handing over 62 prisoners to Pakistan, Morocco, Saudi Arabia and Kuwait, among other countries, from the American prison in Guantánamo Bay, in actions that it has publicly acknowledged. In some of those cases, a senior Defense Department official said in an interview on Friday, the transfers were for the purpose of prosecution and trials, but others were intended solely for the purpose of detention. Those four countries, as well Egypt, Jordan and Syria, were among those identified in a State Department human rights report released last week as practicing torture in their prisons.

15

In an interview, the senior official defended renditions as one among several important tools in counterterrorism efforts. "The intelligence obtained by those rendered, detained and interrogated have disrupted terrorist operations," the official said. "It has saved lives in the United States and abroad, and it has resulted in the capture of other terrorists."

Copyright 2005 The New York Times Company

16

25

**EXHIBIT "3"**

A true copy – retyping was required to correct errors caused by electronic scanning of the document

EXHIBIT "3"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Omar ABU ALI and Faten ABU ALI,<br>    As Next Friends of<br>AHMED ABU ALI,<br>    presently detained in Saudi Arabia, his<br>    residence and that of his Next Friend is<br>    3245 Rio Drive, Apt. 1015<br>    Falls Church, VA 22041<br>        Petitioners<br><br>v.<br><br>John ASHCROFT, Attorney General of the<br>    United States;<br>Robert S. MUELLER, III, Director of the<br>    Federal Bureau of Investigation;<br>Luke KULIGOSKI, Special Agent, Federal<br>    Bureau of Investigation;<br>Other Special Agents of the FBI to be<br>    Identified and Named;<br>Thomas RIDGE, Secretary of the<br>    Department of Homeland Security; and<br>Colin POWELL, United States Secretary<br>    of State,<br>        Respondents | Civil Action No. 1:04-cv-01258 JDB<br><br>Judge John D. Bates<br><br>PETITION FOR<br>HABEAS CORPUS |

## AFFIDAVIT OF BRIAN EVANS

I, Brian Evans, hereby make the following declaration with respect to the above-captioned case:

I am the Saudi Arabia, Bahrain, and Oman Country Specialist for Amnesty International USA (AIUSA). I have a Master's Degree in Middle East Studies from the University of Texas at Austin. In my AIUSA capacity I am charged with monitoring the human rights situation in Saudi Arabia, Bahrain and Oman. I monitor, assist with, and respond to U.S. media coverage of human rights issues in these countries. I interview victims and witnesses of human rights violations in these countries when they are here in the U.S., and testify, or prepare testimony for

26

AIUSA representatives to U.S. government agencies or officials concerned with human rights issues in these countries.

I was first contacted by the family of Ahmed Abu Ali by email in August 2003. They were concerned for his safety both because of Saudi Arabia's reputation for torturing or otherwise abusing detainees, and because of a perceived lack of interest in protecting his rights on the part of U.S. consular officials. Amnesty International has written to U.S. and Saudi Arabian officials seeking clarification of the reasons for Ahmed Abu Ali's detention and seeking assurances that he will be not mistreated, and AIUSA has mobilized its activist members to write these same authorities seeking the same information.

Responses from U.S. officials have been limited to general assurances that Ahmed Abu Ali's rights will be protected; the Privacy Act has been cited as reason for not disclosing more specific information about Ahmed Abu Ali's detention, or any U.S. role in his detention, interrogation, or in protecting his rights. It is not clear that Mr. Abu Ali has never been given the right to waive his rights under the Privacy Act.

As an expert on human rights practices in Saudi Arabia, I subject this affidavit to emphasize the Ahmed Abu Ali remains seriously at risk as long as he remains in detention in Saudi Arabia.

The Saudi Arabian criminal justice system is fundamentally lacking in the basics of due process. The legal protections that do exist in principle in Saudi Arabia, most of which were only enacted in 2002, can be and are easily ignored in high profile cases. In practice, there is no right to a defense attorney or a public trial, or indeed a trial of any kind. Saudi Arabian authorities continue to hold detainees indefinitely without charge or trial. For example, Sa'd ibn Sa'id Al Zu'air has been detained since July of 2002, in connection with his efforts to campaign for the release of his father, a prominent critic of the Saudi Arabian government. Since July 2002 no one, not even his family, has received any information about his status, whereabouts or health. He may or may not have been tried, convicted and sentenced on unknown charges. In this case, as in many others, the legal reforms of 2002 have proved meaningless. (see *Saudi Arabia: Justice Must be seen to be done*, AI Index: MDE 23/010/2004, 1 August 2004) – all Amnesty International documents, including Annual Report entries, are available on the Amnesty International website at: http://web.amnesty.org/library/eng-sau/Index)

In the trials that do take place, confessions are considered of paramount importance, and the use of torture or other forms of ill-treatment to extract confessions is commonplace. A lack of judicial supervision over detaining authorities allows torture to take place with impunity.

Citizens of Western countries are not safe from these abuses. In August, 2003, five British and one Canadian national were released from Saudi Arabian custody following a royal pardon that was obtained by the personal intervention of British Prime Minister Tony Blair. They had been convicted of a series of bombings of Western country nationals that took place in November 2000. Two of the men, William Sampson (Canadian) and Alexander Mitchell (British), were sentenced to death by beheading. The primary evidence for their convictions were confessions, two of which were broadcast on television in February 2001, before the trials had even taken place. The released men claim these confessions were extracted under torture. Methods of torture cited by these men include beatings all over the body and beatings with sticks on the soles

of the feet, sleep deprivation, and shackling and handcuffing for long periods. (see *Amnesty International Report 2004*).

Other methods of torture described to Amnesty International by victims in recent years have included electric shocks, cigarette burns and nail pulling. (see *Saudi Arabia: Culture of Brutality*, AI Index MDE 23/10/00, 1 June 2000)

The U.S. government clearly recognizes the danger to those detained in Saudi Arabia, saying the following about Saudi Arabia in the latest State Department Country Report on Human Rights Practices: "there were credible reports that the authorities abused detainees, both citizens and foreigners. Ministry of Interior officials were responsible for most incidents of abuse of prisoners, including beatings, whippings, and sleep deprivation. In addition, there were allegations of torture, including allegations of beatings with sticks and suspension from bars by handcuffs. There were reports that torture and abuse were used to obtain confessions from prisoners." (see U.S. Department of State: *Country Reports on Human Rights Practices 2003: Saudi Arabia*, http://www.state.gov/g/____/____/____/2003/27837.htm)

Though not mentioned in its most recent report, the U.S. State Department has also reported in recent years that " . . .authorities tortured detainees and pressured them to confess by isolation, blindfolding, and drugging over a period of weeks." (see U.S. Department of State: *Country Report on Human Rights Practices 2001*: Saudi Arabia, http://www.state.gov/g/dri/____/____/2001/nea/8296.htm)

Despite the secrecy under which Saudi Arabian criminal justice is conducted, Amnesty International has documented many cases of torture including the following examples:

- Muhammad Rajkhan, a Saudi Arabian national, reportedly suffered damage to his eardrum and loss of weight as a result of torture and ill-treatment following his arrest in February 2003. (*see Amnesty International Report 2004*)
- In August 2001, a group of Christian foreign nationals from India and East Africa, were detained and, upon their release, provided the following testimony to Amnesty International: "On January 28, 2002 . . . by order of the Bremen Prison commander . . . we were illegally subjected to severe punishment and physical abuse. Being suspended with chains, each of us flogged 80 times with a flexible metal cable, and also severely kicked and beaten with anything that came into their hands . . .Our bodies are wounded, swollen, terribly bruised, and with great pain. Baharu [Mesgistu, Ethiopian national]'s kidney may have been damaged and he is passing blood with his urine." (see *Saudi Arabia Remains a Fertile Ground for Torture with Impunity*, AI Index: MDE 23/004/2002, 1 May 2002)
- Kalesh, an Indian national who was accused of theft and held in incommunicado detention, stated following his release in December 2000: "There were three people in civilian dress . . . They had a big stick with ropes at each end . . . I was asked to sit on the floor . . . At this time I am handcuffed and chained in my legs. The stick with the ropes was inserted through the folding of my knees . . . and the ropes were tied to my handcuffed hands. I became like a football . . . I was sitting/lying on the floor and these three devils started kicking and beating me brutally with the rod . . . There are still marks . . . of that day on my body . . ." (see *Amnesty International Report 2002*)

Ahmed Abu Ali has not legal protections from this kind of abuse in Saudi Arabia. As long as Ahmed Abu Ali remains in Saudi Arabia, his legal rights, and indeed his physical safety, remain seriously at risk.

I declare, under penalty of perjury, that the foregoing is true and correct.

Signed and affirmed to this 17th day of September, 2004, in Travis Co., TX by:


_____
Name - Brian Evans


Sworn and subscribed to before me this 17th day of September, 2004 in Travis Co., TX.


_____
Notary Public - Jack Whitley

My commission expires:  6/7/08

**EXHIBIT "4"**

A true copy – retyping was required to correct errors caused by electronic scanning of the document

**EXHIBIT "4"**

.. High Priority ..

No. 249—05

**IMMEDIATE RELEASE**

**Detainee Transfer Announced**

**March 12, 2005**

The Department of Defense announced today that it transferred three detainees from Guantanamo Bay, Cuba to Afghanistan, Maldives and Pakistan for release. This transfer increases the number of detainees who have departed GTMO to 214.

This transfer includes three detainees found to no longer be an enemy combatant by a Combatant Status Review Tribunal.

The decision to transfer or release a detainee is based on many factors, including whether the detainee is of further intelligence value to the United States and whether the detainee is believed to pose a continuing threat to the United States if released.

There are ongoing processes to review the status of detainees. A determination about the continued detention or transfer of a detainee is based on the best information and evidence available at the time. The circumstances in which detainees are apprehended can be ambiguous, and many of the detainees are highly skilled in concealing the truth.

During the course of the war on terrorism, the Department expects that there will be other transfers or releases of detainees.

provided.

Because of operational and security considerations, no further details can be Prior to this transfer, 211 detainees had departed GTMO .

for release, and 65 transferred to the control of other governments to Pakistan, five to Morocco, seven to France, seven to Russia, four to Saudi Arabia, to Spain, one to Sweden, one to Kuwait, one to Australia and nine to Great Britain). hundred and fourteen detainees have now departed Guantanamo. There are approximately detainees currently at Guantanamo.

http: //www.dod.mil/releases/2005/nr20050312—2226.html

**EXHIBIT "5"**

A true copy – retyping was required to correct errors caused by electronic scanning of the document

**EXHIBIT "5"**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOES 1—570,<br>    Unidentified Detainees<br>    Guantánamo Bay Naval Station<br>    Guantánamo Bay, Cuba<br><br>*Petitioners*<br><br>v.<br><br>GEORGE W. BUSH, et al.,<br><br>*Respondents.*<br>All sued in their official capacity | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     No. 1:05CV00313<br><br>    Kollar-Kotelly, J. |

## DECLARATION OF GITANJALI S. GUTIERREZ

I, Gitanjali S. Gutierrez, pursuant to 28 U.S.C. §1746, hereby declare and say as follows:

1. I am an associate at Gibbons, Del Deo, Dolan. Griffinger & Vecchione, P.C., and counsel for petitioners in *Begg, et al., v. Bush, et al.,* Civ. Action No. 04-1137 (RMC).

2. I received a phone call earlier this morning, Saturday, March 12, *2005,* from Mr. Baher Azmy, Esq., Seton Hall Law School Center for Social Justice, who is counsel for *habeas* petitioner Murat Kurnaz in *Kurnaz v. Bush,* Civ. Action No. 04-1135 (JDB).

3. Mr. Azmy is currently in Bremen, Germany, meeting with his foreign co-counsel in *Kurnaz v. Bush.*

4. He called me because he received information from his client's family that Murat Kurnaz had been moved from Guantanamo Bay Naval Base over the weekend. Mr. Azmy sought contact information for counsel for the government in order to confirm his client's status, his client's destination, and the conditions of his client's transfer. The government had refused Mr. Azmy's repeated requests that he be given advance notice of his client's transfer.

5. I spoke with Mr. Azmy later on Saturday, March 12, 2005, and learned that counsel for the government was unable to provide Mr. Azmy with any further information about his client's status.

6. Because Mr. Azmy is out of the country and unable to submit a signed declaration, I requested that be memorialize this information in an email to me. His email is attached to

this declaration as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 12.2005.

Gitanjali S. Gutierrez

# Exhibit A

A true copy – retyping was required to correct errors caused by electronic scanning of the document

**Gutierrez, Gitanjali S.**

From:      Baher Azmy [azmybahe@shu.edu]
Sent:      Saturday, March **12, 2005 6:31** PM
To:        Gutierrez, Gitanjali S.
Subject:   Murat Kurnaz

Gita,

I am in Bremen, Germany, meeting with my co-counsel on Murat Kurnaz's who, as you know is a Turkish citizen and permanent resident of Germany. This afternoon, we got word from Murat's mother, that family members In Turkey had been contacted by Turkish military officials to inform them that Murat would be arriving from Guantanamo to the U.S. military air force base in Eastern Turkey within a day. She soon after contacted an acquaintance of hers in the Turkish foreign ministry who told her that he had heard some rumors to this effect; later he called her to say that Murat was in flight somewhere and should be arriving to the U.S. base tomorrow sometime. Since it is the weekend, my German co-counsel and I have been unable to confirm this information ourselves with U.S. or Turkish or German officials. Needless to say, we are surprised and concerned. I have emailed counsel for the government, Terry Henry, inquiring about my client's status and his client's actions; he didn't have any information but offered to look into the situation and get beck to me. I have no Idea what the U.S. intends to do with him once he arrives at the base or what agreement they have with the Turkish government, if any, to keep him there or transfer him someplace else.

I had no prior information from the government that my client would be removed from Guantanamo. We had meetings with the German government officials this week, none of whom had any indication that Murat might be released from Guantanamo any time soon. I had contact with the Turkish embassy in Washington about 5 weeks ago and at that time, they had no information about his release and promised to inform me if they got any such information. Had they known about his release any time this week, I believe they would have contacted me. I don't even know what prompted his release, whether it was an ARB or the information declassified last Friday and made public on Wednesday, that U.S. intelligence has known for two years that Murat had no connection with terrorism.
I hope to find out more in the next couple of days from Turkish officials in Ankara, including learning about the conditions of his transfer from Guantanamo. I'll try to keep you Informed as I learn more.

Baher Azmy
Associate Professor
Seton Hall Law School
833 McCarter Highway
Newark, NJ 07102
(973) 642-8291

34

**EXHIBIT "6"**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JAMIL EL-BANNA <u>et</u> <u>al</u>., | ) |
| | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Civil Action No. 04-1144 (RWR) |
| | ) |
| GEORGE W. BUSH <u>et</u> <u>al</u>., | ) |
| | ) |
| Respondents. | ) |
| | ) |
| HANI SALEH RASHID ABDULLAH <u>et</u> <u>al</u>., | ) |
| | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Civil Action No. 05-23 (RWR) |
| | ) |
| GEORGE W. BUSH <u>et</u> <u>al</u>., | ) |
| | ) |
| Respondents. | ) |
| | ) |
| ABDULLAH IBRAHIM ABDULLAH AL RASHAIDAN <u>et</u> <u>al</u>., | ) |
| | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Civil Action No. 05-586 (RWR) |
| | ) |
| GEORGE W. BUSH <u>et</u> <u>al</u>., | ) |
| | ) |
| Respondents. | ) |

-2-

## MEMORANDUM ORDER

Petitioners Jamil El-Banna, Bisher Al-Rawi, Martin Mubanga,[1] Hani Abdullah, Rami Al-Oteibi,[2] and Abdullah Al Rashaidan,[3] in three separate cases seek writs of habeas corpus, challenging the legality of their detention by the United States at Guantanamo Bay Naval Base, Cuba.  Respondents moved for a stay of proceedings in each case pending resolution of the appeals in In re Guantanamo Detainee Cases, — F. Supp. 2d — , 2005 WL 195356 (D.D.C. Jan. 31, 2005), appeal docketed, No. 05-8003 (D.C. Cir. March 10, 2005), and Boumediene v. Bush et al., — F. Supp. 2d — , 2005 WL 100924 (D.D.C. Jan. 19, 2005), appeal docketed, No. 05-5062 (D.C. Cir. March 10, 2005).  A primary purpose of a stay pending resolution of the issues on appeal is to preserve the status quo among the parties.  Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977) (a stay pending appeal is preventative or protective, and seeks to maintain the status quo pending a final determination of issues on appeal); see Warm Springs Dam Task Force v. Gribble, 417 U.S. 1301, 1310 (1974) (granting stay pending appeal to

---

[1]   Petitioner-detainees in Civil Action No. 04-1144.

[2]   Petitioner-detainees in Civil Action No. 05-23.

[3]   Petitioner-detainee in Civil Action No. 05-586.

-3-

maintain the status quo between the parties).  In Civil Action
No. 04-1144, Judge Joyce Hens Green entered a stay order on
February 3, 2005.  (Dkt. # 122.)  In Civil Action No. 05-23, a
stay was entered on March 16, 2005 that nevertheless allowed
petitioners to seek from this court emergency relief in
appropriate circumstances, such as when petitioners reasonably
believe they will be removed from the jurisdiction of this court.
(Dkt. # 16).[4]  In Civil Action No. 05-586, respondents' motion to
stay the proceedings is pending.

In each action, petitioners have moved for a preliminary
injunction to enjoin respondents from transferring any of the
petitioner-detainees from United States custody at Guantanamo Bay
Naval Base to any other location or any other custodian without
providing 30 days notice of the intended transfer or removal.
Petitioners fear that respondents may involuntarily "render" the
detainees to other countries, where they may be subject to
continued detention without due process of law or to mental or
physical abuse, and, by means of transfer, divest this court of
jurisdiction either as a practical or legal matter.  Respondents
oppose petitioners' motions for a preliminary injunction.

---

[4]  A protective order was entered in that case on the same
day.  (Dkt. # 17.)

-4-

Petitioners' fears do not appear fanciful.  Petitioners cite to a report of an investigative journalist describing the rendition of several named individuals who have been transferred in and out of United States custody, a practice respondents have not denied in these proceedings.  Further, respondents concede they have transferred custody of many Guantanamo detainees to foreign sovereigns and assert that such transfer divests this court of jurisdiction over pending habeas corpus petitions.  Another press report cited by petitioners, and not denied by respondents, indicates that respondents either have, or had, plans to accelerate the transfer of Guantanamo detainees to other sovereigns and other locations.

The outcome petitioners fear, if realized, would improperly subvert the court's ability to adjudicate these actions on their merits.  See Rasul v. Bush, 124 S. Ct. 2686, 2698 (2004) ("We therefore hold that [28 U.S.C.] § 2241 confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base.").  Furthermore, such a result would nullify the stay's purpose of preserving the status quo between the parties.

"It is well established that 'the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the

-5-

protection of their rights in those tribunals.'" Abu Ali v.

Ashcroft, 350 F. Supp. 2d 28, 54 (D.D.C. 2004) (quoting Alabama

Great S. R. Co. v. Thompson, 200 U.S. 206, 218 (1906)).  In

addition, a court may, in appropriate situations, specify

protective conditions in balancing the hardship necessarily

imposed on the party whose suit or execution of judgment has been

stayed pending appeal. Cooks v. Fowler, 459 F.2d 1269, 1272-73 &

n.27 (D.C. Cir. 1971) (affirming condition of stay requiring

tenant appealing judgment to deposit funds in court registry

pending appeal); see also, City of Portland, Or. v. Federal

Maritime Comm'n, 433 F.2d 502, 504 (D.C. Cir. 1970) (directing

the proponent of a stay in a case challenging shippers' exclusion

of one city's port from service to "be prepared to state reasons

why this court should not impose a conditional stay requiring the

rotation of service among the ports involved pending final review

and determination."); Scott v. Scott, 382 F.2d 461, 462 (D.C.

Cir. 1967) (discussing a stay of execution of judgment

conditioned upon support payments); Center for Int'l

Environmental Law v. Office of the U.S. Trade Rep., 240 F. Supp.

2d 21, 23 (D.D.C. 2003) (conditioning stay pending appeal on

party seeking an expedited appeal).  Where, as here, the

condition imposed on the proponent of the stay is "neither heavy

nor unexpected," imposing a protective condition is well within a

-6-

court's discretion.  Cooks v. Fowler, 459 F.2d at 249 (quoting

Bell v. Tsintolas Realty Co., 430 F.2d at 482 (D.C. Cir. 1970)

(stating "[w]e have little doubt that . . . [a court] may fashion

an equitable remedy to avoid placing one party at a severe

disadvantage during the period of litigation")).

> Therefore, here
>
> the court will "guard against depriving the processes
> of justice of their suppleness of adaptation to varying
> conditions." Landis v. North American Co., 299 U.S.
> 248, 256 (1936).  Coextensive with a district court's
> inherent power to stay proceedings is the power to
> craft a stay that balances the hardships to the
> parties.  Id. at 255 (noting concern regarding a stay
> causing "even a fair possibility . . . [of] damage to
> some one else."); see also Clinton v. Jones, 520 U.S.
> 681, 707 (1997) (noting that "burdens [to the parties]
> are appropriate matters for the District Court to
> evaluate in its management of the case.").

Al-Oshan v. Bush, Civil Action No. 05-520 (D.D.C. Mar. 31, 2005)

(Urbina, J.) (Order, Dkt. # 12).  Accordingly, it is hereby

ORDERED that respondents' motion for a stay in Civil Action

No. 05-586 (Dkt. # 5) be, and hereby is, GRANTED in part and

DENIED in part.  The proceedings in Civil Action No. 05-586 are

STAYED pending resolution of the appeals pending before the

United States Court of Appeals for the District of Columbia

Circuit, in In re Guantanamo Detainee Cases and Boumediene v.

Bush et al., except that petitioners in Civil Action Nos. 04-1144

and 05-586 may seek emergency relief from this court in

-7-

appropriate circumstances, such as when petitioners have reason

to believe that they are facing the possibility of continued

detention at the request of the United States in a location that

does not provide access to this court.  It is further

ORDERED that in all three cases captioned above,

respondents, their agents, servants, employees, confederates, and

any persons acting in concert or participation with them, or

having actual or implicit knowledge of this Order by personal

service or otherwise, may not transfer or remove the detained

petitioners from United States custody at Guantanamo Bay unless

this court and counsel for petitioners receive thirty days'

advance notice of such transfer or removal.  It is further

ORDERED that, given the ongoing conduct of combatant status

review tribunals, respondents shall file factual returns relating

to each detained petitioner within 30 days after entry of a

protective order in that petitioner's action, unless such returns

have been filed already.  It is further

ORDERED that the motions for a preliminary injunction in all

three cases captioned above (Dkt. # 128, Civil Action No. 04-

1144; Dkt. # 15, Civil Action No. 05-23; Dkt. # 3, Civil Action

No. 05-586) be, and hereby are, DENIED as moot.

-8-

SIGNED this 8th day of April, 2005.


_____/s_____
RICHARD W. ROBERTS
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Yousif Abdullah Al-Rubaish, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | Civil No.  05-cv-1714-RWR |
| v. | ) | |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## [DRAFT] ORDER REQUIRING ADVANCE NOTICE OF TRANSFER

The Court, having considered Petitioners' Motion for Preliminary Injunction Requiring Respondents to Provide Counsel for Petitioners and the Court with 30 Days' Advance Notice of Any Intended Removal of Petitioner from Guantánamo, hereby:

**ORDERS** that the Motion is granted:

**IT IS FURTHER ORDERED THAT**:

    (a)    Respondents provide counsel for Petitioners and the Court with thirty days' advance notice of any intended removal of Petitioner Yousif Abdullah Al-Rubaish from Guantánamo Bay Naval Base;

    (b)    Respondents obtain Court approval before such transfer has first been obtained; and

    (c)    Petitioners be allowed expedited discovery if Respondents challenge any facts upon which this Motion is based.

Dated: _____        BY THE COURT:

 

_____

RICHARD W. ROBERTS
United States District Judge