## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Yousif Abdullah Al-Rubaish, *et al.,* | ) | |
| | ) | |
| Petitioners/Plaintiffs, | ) | |
| | ) | Civil No.  05-cv-1714-RWR |
| v. | ) | |
| | ) | |
| GEORGE W. BUSH, *et al.,* | ) | |
| | ) | |
| Respondents/Defendants. | ) | |
| | ) | |

## <u>MOTION FOR PRESERVATION ORDER</u>

Petitioner Yousif Abdullah Al-Rubaish in the above-captioned case, acting through his Next Friend, respectfully submits this motion requesting the Court to order Respondents to preserve and maintain all evidence, documents and information, without limitation, in their possession, custody or control regarding Petitioner.  The grounds for said motion are contained in the accompanying memorandum of points and authorities.

Dated:  November __, 2005                 Respectfully submitted,

                                          Counsel for Petitioners:

                                          _____
                                          Michael Rapkin
                                          Law Offices of Michael Rapkin
                                          California State Bar No. 67220
                                          1299 Ocean Avenue, Suite 900
                                          Santa Monica, California  90401
                                          Tel:  (310) 656-7880
                                          Fax:  (310) 656-7883


                                          *Of Counsel*
                                          Barbara Olshansky (NY0057)
                                          Tina Monshipour Foster (NY5556)
                                          Gitanjali S. Gutierrez (NY1234)
                                          CENTER FOR CONSTITUTIONAL RIGHTS
                                          666 Broadway, 7th Floor
                                          New York, New York 10012
                                          Tel: (212) 614-6439
                                          Fax: (212) 614-6499

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Yousif Abdullah Al-Rubaish, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| | ) | Civil No.  05-cv-1714-RWR |
| v. | ) | |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITIONER'S MOTION FOR PRESERVATION ORDER**

Petitioner Yousif Abdullah Al-Rubaish, through his undersigned counsel, respectfully

moves this Court to order the Respondents to preserve and maintain all evidence, documents, and

information, without limitation, now or ever in Respondents' possession, custody or control,

regarding Petitioner.[1]  A preservation order is critical to the fair adjudication of this case,

particularly because Respondents have sought and received stays of the prosecution of these

proceedings and because Respondents refuse to provide all relevant evidence and information

relating to Petitioners.[2]  Petitioner and his counsel have no records.  Respondents are in

possession of all records related to Petitioner.

Judge Richard W. Roberts has already ruled on an almost identical motion for

preservation presented to him in the two cases of *Jamil El-Banna v. Bush*, Civ. No. 04-1144

(RWR) and in *Hani Saleh Rashid Abdullah v. Bush*, Civ. No. 05-0023 (RWR).

---

[1] As used in this motion, "documents" has the full meaning given it under Fed.R.Civ.Pro. 33.

[2] Pursuant to LCvR 7(m), the undersigned conferred with Respondents' counsel via e-mail regarding this
Motion for Preservation Order and Respondents' counsel indicated that they would not consent.

His Honor issued an Order on July 18, 2005 in both of these cases, which reads in pertinent part as follows:

> "It is further ORDERED that petitioners' motions otherwise be, and hereby are, GRANTED. Respondents shall preserve and maintain all evidence, documents and information, without limitation, now or ever in respondents' possession, custody or control, regarding the individual detained petitioners in these cases." (Exhibit "1".)

Respondents, of course, had a full and fair opportunity to oppose these motions.

Respondents have also had a full and fair opportunity to oppose a motion for a nearly identical order in *Jarallah Al Marri v. Bush*, Civ. No. 04-2035 (GK), and in *Abdul-Salam Gaithan Mureef Al-Shiry v. Bush*, Civ. No. 05-0490 (PLF). In both of those cases, the District Court issued an Order requiring preservation of evidence similar to the order sought here. Under familiar principles of collateral estoppel, this Court should issue a similar order. *See Parklane Hosier Co. v. Shore*, 439 U.S. 322, 331-33 (1979).

Apart from the previous rulings, a preservation order is needed in this case. This Court is empowered to enter such an order when circumstances warrant it. *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 138 n.8 (2004); *see also United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 21, 23 (D.D.C. 2004) (discussing document preservation order). The court in *Pueblo of Laguna* set forth a two-part test to determine when such an order should issue. It required that the party seeking "a preservation order demonstrate that it is [1] necessary and [2] not unduly burdensome." *Pueblo of Laguna*, 60 Fed. Cl. at 138.[3]

---

[3] The Petitioners need not meet the burdens associated with a preliminary injunction. As the Court of Federal Claims explained in *Pueblo of Laguna*, "[a] document preservation order is no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery." 60 Fed. Cl. at 138 n.8. Although such pretrial and discovery orders take the basic form of an injunction (an order to do or not to do something), the case law shows that, in issuing them, courts need not observe the rigors of the four-factor analysis ordinarily employed in issuing injunctions. *Jarallah Al-Marri v. Bush*, Civ. No. 04-2035; *see also Pueblo of Laguna*, at 138 n.8 (court's case management power, rather than power to enter injunction, is basis for preservation order); *Casey v. Planned Parenthood*, 14 F.3d 848, 854 (3d Cir. 1994) (distinguishing such pretrial orders from injunctions for appeal purposes). "In the court's view, such an approach [requiring the movant to met the burden
(continued...)

Here, the first prong is easily met:  there is legitimate concern that Respondents will not maintain sensitive evidence it now possesses about the torture, mistreatment, and abuse of the detainees now at Guantanamo.  The FBI has produced records pursuant to a Freedom of Information Act lawsuit by the American Civil Liberties Union that document efforts by the military to "cover up" evidence of the physical abuse of detainees.  *See* Urgent Report, dated June 25, 2004 (Exhibit "2").  Specifically, an FBI email confirms that unnamed individuals "observed numerous physical abuse incidents . . . . includ[ing] strangulation, beatings, placement of lit cigarettes into the detainees['] ear openings, and unauthorized interrogations."  *Id.* at 2.  The email further reports that unnamed individuals "were engaged  in a cover-up of these abuses."  *Id.*  The specific "cover-up efforts" were identified in the email, but redacted before it was produced.  *Id.*  *The New York Times* also has reported that the military's own investigations into detainee abuse were harmed because "crucial witnesses were not interviewed, documents disappeared, and at least a few pieces of evidence were mishandled."  Tim Golden, "Army Faltered in Investigating Detainee Abuse," *The New York Times*, May 22, 2005, at A1 (Exhibit "3") (referencing "confidential documents from the investigation obtained by *The New York Times*").

This very specific report warrants immediate issuance of the order.  But there is more.  On or about May 21, 2005, *The New York Times* reported that two prisoners in military custody had been murdered by their U.S. military jailers.  *Id.*  This comes on top of numerous reports of

---

(continued...)

normally required for an injunction] would be decidedly to put the cart before the horse."  *Pueblo of Laguna*,  at 138 n.8.

torture, prisoner kidnapping (rendition), and ingenious physical and psychological abuse of prisoners in military custody in connection with our "war on terror".

We fully expect the Government's attorneys to argue that no order is needed here because Respondents "are fully aware of their responsibilities not to destroy evidence." Counsel's assurance hardly suffices in light of the foregoing track record. The pattern of lawless tactics visited by the military apparatus against its prisoners belie any such assurances. Judge Roberts already stated in his Memorandum Opinion and Order of July 18, 2005 in the El-Banna and Abdullah cases that ". . . a preservation order in habeas proceedings, particularly in proceedings such as these where there has been no full disclosure of the facts on the public records to authorize the challenged detention, is not superfluous or unnecessary." (Exhibit "1".)

The second prong, too, is met. The District Court, in entering a previous order, specifically found that "entering a preservation order [against Respondents] will inflict no harm or prejudice upon them." *Jarallah Al-Marri v. Bush*, Civ. No. 04-2035 (GK).

Indeed, Judge Roberts spoke to the "burdensome" issue in his said July 18, 2005 Memorandum Opinion and Order in which he stated that "[T]he requested order imposes no greater obligation on Respondents than the federal discovery rules' preservation obligations impose on a litigant in a typical civil lawsuit." (p.6) His Honor then proceeded to state that "[R]espondents' contrary view of the requested order may underscore the need for a preservation order." (p.6)

The loss of evidence regarding Petitioners' detention and possible mistreatment or torture could irreparably harm Petitioners by depriving them of proof that their present imprisonment is unlawful and is thus depriving them of their liberty. In contrast, it would be no burden at all on the Government to preserve this evidence.

The records sought to be preserved will be most important in allowing Petitioner to pursue his legal claims, and the Government should be required to preserve them pending a resolution of this matter.  Until the Court of Appeals clarifies the matter, no one knows exactly what procedure and evidentiary rules will govern the eventual determinations of "enemy combatant" status which the Supreme Court said in *Rasul* must underlie lawful imprisonment. Whatever these rules are, the statements made by prisoners to their captors and the conditions under which they made them are bound to play a pivotal role.  The Respondents have every reason to camouflage the circumstance under which such "admissions," as they deem useful, were made.

WHEREFORE, for the foregoing reasons, the motion should be granted.  A proposed order is attached hereto.

Dated:  November __, 2005

Respectfully submitted,

Counsel for Petitioners:

_____

Michael Rapkin
Law Offices of Michael Rapkin
California State Bar No. 67220
1299 Ocean Avenue, Suite 900
Santa Monica, California  90401
Tel:  (310) 656-7880
Fax:  (310) 656-7883

*Of Counsel*
Barbara Olshansky (NY0057)
Tina Monshipour Foster (NY5556)
Gitanjali S. Gutierrez (NY1234)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

**EXHIBIT "1"**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                              )
JAMIL EL-BANNA et al.,        )
                              )
      Petitioners,            )
                              )
v.                            )    Civil Action No. 04-1144 (RWR)
                              )
GEORGE W. BUSH et al.,        )
                              )
      Respondents.            )
                              )
HANI SALEH RASHID ABDULLAH    )
  et al.,                     )
                              )
      Petitioners,            )
                              )
v.                            )    Civil Action No. 05-23 (RWR)
                              )
GEORGE W. BUSH et al.,        )
                              )
      Respondents.            )
                              )
```

## MEMORANDUM OPINION AND ORDER

Petitioners in each of the above-captioned habeas corpus proceedings -- foreign nationals detained at Guantanamo Bay in the custody of the United States, or their next friends -- seek an order directing respondents to "preserve and maintain all evidence, documents, and information regarding the torture, mistreatment, and abuse of detainees now at the Guantanamo Bay detention facility, and to preserve and maintain all evidence, documents and information relating or referring to Petitioners."

-2-

(Mot. for Preservation Order.)[1]  Respondents oppose each motion,

arguing that the requested order is superfluous in light of their

well-understood preservation obligations, yet also overbroad and

burdensome.  (Opp'n at 5, 7.)[2]  Because a preservation order can

be appropriate in a habeas corpus proceeding, but is only

partially warranted here, petitioners' motions will be granted in

part and denied in part.

Respondents argue that because they are well aware of their

preservation obligations, to "'supplement every complaint with an

order requiring compliance with the Rules of Civil Procedure

would be a superfluous and wasteful task, and would likely create

no more incentive upon the parties than already exists.'"  (Opp'n

at 5, quoting Hester v. Bayer Corp., 206 F.R.D. 683, 685 (M.D.

Ala. 2001)).[3]  Respondents then conclude that petitioners'

_____

[1]  El-Banna, Dkt. 145; Abdullah, Dkt. 30.

[2]  El-Banna, Dkt. 147; Abdullah, Dkt. 32.

[3]  The parties advocate different standards for preservation
orders, a dispute that need not be resolved here.  First, the
distinction between the standard articulated in Pueblo of Laguna
v. United States, 60 Fed. Cl. 133 (2004), urged by petitioners,
and the standard four-factor test employed in preliminary
injunction decisions, urged by respondents (see Opp'n at 3), may
be one without a practical difference.  See also, Hester, 206
F.R.D. at 685.  Second, respondents argue that a preservation
order must meet the test of a preliminary injunction (Opp'n at
3), but also concede that the Federal Rules of Civil Procedure
impose preservation obligations on civil litigants in every civil
action filed, automatically and without court review (Opp'n

-4-

> [The Supreme Court has] held explicitly that the
> purpose and function of the All Writs Act to supply the
> courts with the instruments needed to perform their
> duty [to issue orders appropriate to assist them in
> conducting factual inquiries] . . . extend to habeas
> corpus proceedings.
>
> At any time in the [habeas corpus] proceedings, when
> the court considers that it is necessary to do so in
> order that a fair and meaningful evidentiary hearing
> may be held so that the court may properly "dispose of
> the matter as law and justice require," either on its
> own motion or upon cause shown by the petitioner, it
> may issue such writs and take or authorize such
> proceedings with respect to development, before or in
> conjunction with the hearing of the facts relevant to
> the claims advanced by the parties, as may be
> "necessary or appropriate in aid of [its jurisdiction]
> . . . and agreeable to the usages and principles of
> law." 28 U.S.C. § 1651.
>
> . . . Obviously, in exercising this power, the court
> may utilize familiar procedures, as appropriate,
> whether these are found in the civil or criminal rules
> or elsewhere in the "usages and principles of law."

394 U.S. at 299-300 (footnote omitted). The opinion in Harris v.

Nelson does not support respondents' suggestion that the

requested preservation order "goes beyond . . . any discovery

that might ever be appropriate in a habeas case." (Opp'n at 7.)[4]

---

[4] Respondents' statement, that "Petitioners' proposal
improperly, and without good cause, would put respondents in the
position of having to take action with respect to a wide range of
documents without having the opportunity to utilize the process
of objection and litigation available in the discovery context to
fine tune or challenge discovery requested based on, for example,
overbreadth, relevance, or burden" (Opp'n at 7), mistakenly
equates preservation obligations with production obligations and
erroneously presumes that respondents will have no opportunity to
litigate future discovery requests.

-5-

To the contrary, "the power of inquiry on federal habeas corpus
is plenary" and its exercise depends entirely on the
circumstances.  Harris v. Nelson, 394 U.S. at 291.

Petitioners' filings challenge the fact and duration of
their custody as being in violation of the Constitution or laws
or treaties of the United States, matters that are cognizable
under the general habeas statute.  See Rasul v. Bush, 124 S.Ct.
2686, 2698 (2005) ("§ 2241 confers . . . jurisdiction to hear
petitioners' habeas corpus challenges to the legality of their
detention at the Guantanamo Bay Naval Base"); Chatman-Bey v.
Thornburgh, 864 F.2d 804, 807 (D.C. Cir. 1988) (a prisoner's
challenge to the date on which he was eligible to be considered
for parole "falls comfortably within the broad reach of habeas
corpus").  The petitions also raise other complaints for which
habeas relief has not been foreclosed, namely, that certain
conditions they face in detention constitute violations of
specific provisions of the Constitution, laws or treaties of the
United States.  See Preiser v. Rodriquez, 411 U.S. 475, 499
(1973) ("When a [state] prisoner is put under additional and
unconstitutional restraints during his lawful custody, it is
arguable that habeas corpus will lie to remove the restraints
making the custody illegal.") (citation omitted); Johnson v.
Avery, 393 U.S. 483 (1969) (removing restraint on the habeas

-6-

corpus petitioner's ability to assist fellow prisoners in writ-

writing).  The preservation order requested is tailored to

preserve "documents and information in . . . [respondents']

possession" that may be "relevant to litigation or potential

litigation or are reasonably calculated to lead to the discovery

of admissible evidence."  Wm. T. Thompson Co. v. General

Nutrition Corp., 593 F. Supp. 1443, 1455 (C.D. Cal. 1984).

Documents evidencing treatment of detainees -- whether statements

of official policy, cumulative evidence of specific practices, or

something else -- may be probative of the treatment of

petitioners or may lead to other probative evidence.  The

requested order imposes no greater obligation on respondents than

the federal discovery rules' preservation obligations impose on a

litigant in a typical civil lawsuit.  Respondents' contrary view

of the requested order (Opp'n at 7) may underscore the need for a

preservation order.

     However, since the very preservation order sought by

petitioners for all materials regarding treatment of all

Guantanamo Bay detainees has already been issued against the same

respondents in Al-Marri v. Bush, Civ. No. 04-2035 (D.D.C. Mar. 7,

2005) (Order), and Abdah v. Bush, Civ. No. 04-1254 (D.D.C. June

10, 2005) (Order), respondents here are already under a duty to

-7-

preserve those records and another preservation order would be

unnecessary.   Accordingly, it is hereby

ORDERED that petitioners' motions, insofar as they seek

preservation orders governing evidence, documents, and

information regarding the torture, mistreatment and/or abuse of

detainees held at the Guantanamo Bay detention facility be, and

hereby are, DENIED without prejudice as moot.   It is further

ORDERED that petitioners' motions otherwise be, and hereby

are, GRANTED.   Respondents shall preserve and maintain all

evidence, documents and information, without limitation, now or

ever in respondents' possession, custody or control, regarding

the individual detained petitioners in these cases.

SIGNED this 18th day of July, 2005.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge

**EXHIBIT "2"**



- Iraqi detainee abus                                                    Page 1

b6 -1
b7C -1

**URGENT REPORT**

DATE:        JUNE 25, 2004

TO:          THE DIRECTOR

CC:          Deputy Director Bruce J. Gebhardt
             EAD Cassandra Chandler
             EAD John Pistole
             AD Grant Ashley
             AD Gary Bald
             SC Arthur Cummings

b6 -1
b7C -1        UC
             SSA
             CT Watch
             SIOC

FROM:        SACRAMENTO DIVISION

FOR FURTHER INFORMATION CONTACT: ASAC David A. Picard   b2 -1
                                        (Main Office)   b2 -1
                                                        b6 -1
PREPARER OF URGENT REPORT:        SSA                    b7C -1

PURPOSE:  THE FOLLOWING INFORMATION PROVIDES INITIAL DETAILS FROM
AN INDIVIDUAL
          WHO OBSERVED SERIOUS PHYSICAL ABUSES OF CIVILIAN DETAINEES
IN        IRAQ DURING THE PERIOD OF          IT IS BEING
FURNISHED TO THE DIRECTOR BASED UPON POTENTIAL SIGNIFICANT
PUBLIC, MEDIA AND CONGRESSIONAL INTEREST WHICH MAY GENERATE CALLS
TO THE DIRECTOR.

SUBJECT:  PRELIMINARY STATEMENTS MADE BY
                      TO SACRAMENTO SPECIAL AGENTS
AND

DESCRIPTION OF MATTER:

                                      was advised that the Sacramento Field Office
was not aware of any such report.

DETAINEES-1609

1609
4910

Iraqi detainee abuses    Page 2

b6 -1
b7C -1

**URGENT REPORT**

b7A -1
b6 -3
b7C -3
b7D -1

came into the Sacramento Field Office and provided the following:

observed numerous physical abuse incidents of Iraqi civilian detainees conducted in _____ Iraq. He described that such abuses included strangulation, beatings, placement of lit cigarettes into the detainees ear openings, and unauthorized interrogations.

b7A -1
b6 -3,4
b7C -3,4
b7D -1

was providing this information to the FBI based on his knowledge that _____ were engaged in a cover-up of these abuses. He stated these cover-up efforts included

b7A -1
b6 -3,4
b7C -3,4
b7D -1

b7A -1
b6 -3,4
b7C -3,4
b7D -1

b7A -1
b6 -3,4,5
b7C -3,4,5
b7D -1

advised that an individual did, in fact, make a complaint with Sacramento FBI Office concerning Iraqi prisoner abuse.

b7A -1
b6 -3,4,5
b7C -3,4,5
b7D -1

b7A -1
b6 -3
b7C -3
b7D -1

DETAINEES-1610

1610

4911



Iraqi detainee abuses and

Page 3

b6 -1
b7C -1

b7A -1
b6 -3
b7C -3
b7D -1

## URGENT REPORT

b7A -1
b6 -3
b7C -3
b7D -1

The Sacramento Division is continuing to interview
and will forward FBIHQ all details of his interview in future
communications.  Investigation in Sacramento is continuing.

DETAINEES-1611

1611

4912

**EXHIBIT "3"**

# The New York Times

MAY 2 3 2005

**EARLY EDITION**

New York: Sunday, cloudy, a shower, high 59. Sunday night, clouds, low 49. Monday, showers, high 58. Weather map, Page 28.

Copyright © 2005 The New York Times

*NEW YORK, SUNDAY, MAY 22, 2005*

$4.50 beyond the greater New York metropolitan area.

**$3.50**

LIBRARY

## Christian Mission to the Top

### angelicals Set Their Sights on the Ivy League



Fred R. Conrad/The New York Times

..kov in Manning Chapel at Brown University. Mr. Havens leads a morning prayer session in the chapel.

sanctuary upstairs.

Like most of the Ivy League universities, Brown was founded by Protestant ministers as an expressly Christian college. But over the years it gradually shed its religious affiliation and became a secular institution, as did the other Ivies. In addition to Buddhists, the Brown chaplain's office now recognizes "heathen/pagans" as a "faith community."

But these days evangelical students like those in Mr. Havens's prayer group are becoming a conspicuous presence at Brown. Of a student body of 5,700, about 400 participate in one of the evan-



**CLASS MATTERS**

*Fourth article of a series.*

gelical student groups — more than the number of active mainline Protestants, the campus chaplain says. And these students are in the vanguard of a larger social shift not just on campuses but also at golf resorts and in boardrooms; they are part of an expanding beachhead of evangeli-

cals in the American elite.

The growing power and influence of evangelical Christians is manifest everywhere these days, from the best-seller lists to the White House, but in fact their share of the general population has not changed much in half a century. Most pollsters agree that people who identify themselves as white evangelical Christians make up about a quarter of the population, just as they have for decades.

What has changed is the class status of evangelicals — Protes-

Continued on Page 22

---

*Army Faltered In Investigating Detainee Abuse*

**Skepticism and Delay in 2 Afghans' Deaths**

**By TIM GOLDEN**

Despite autopsy findings of homicide and statements by soldiers that two prisoners died after being struck by guards at an American military detention center in Bagram, Afghanistan, Army investigators initially recommended closing the case without bringing any criminal charges, documents and interviews show.

Within days after the two deaths in December 2002, military coroners determined that both had been caused by "blunt force trauma" to the legs. Soon after, soldiers and others at Bagram told the investigators that military guards had repeatedly struck both men in the thighs while they were shackled and that one had also been mistreated by military interrogators.

Nonetheless, agents of the Army's Criminal Investigation Command reported to their superiors that they could not clearly determine who was responsible for the detainees' injuries, military officials said. Military lawyers at Bagram took the same position, according to confidential documents from the investigation obtained by The New York Times.

"I could never see any criminal intent on the part of the M.P.'s to cause the detainee to die," one of the lawyers, Maj. Jeff A. Bovarnick, later told investigators, referring to one of the deaths. "We believed the M.P.'s story, that this was the most combative detainee ever."

The investigators' move to close the case was among a series of apparent missteps in an Army inquiry that ultimately took almost two years to complete and has so far resulted in criminal charges against seven soldiers. Early on, the documents show, crucial witnesses were not interviewed, documents disappeared, and at least a few pieces of the evidence were mishandled.

While senior military intelligence officers at Bagram quickly heard reports of abuse by several interrogators, documents show they also failed to file reports that are mandatory when any intelligence personnel are suspected of misconduct, including the mistreatment of detainees. Those reports would have alerted military intelligence officials in the United States to a problem in the unit, military officials said.

Those interrogators and others from Bagram were later sent to Iraq and were assigned to Abu Ghraib prison. A high-level military inquiry last year found that the captain who led interrogation operations at Bagram, Capt. Carolyn A. Wood, applied many of the same harsh meth-

Continued on Page 18

---

## U.S. MEMO FAULTS AFGHAN LEADER ON HEROIN FIGHT

### BRITAIN ALSO CRITICIZED

**Local Elders and Officials Said to Block Attack on Huge Drug Trade**

**By DAVID S. CLOUD and CARLOTTA GALL**

WASHINGTON, May 21 — United States officials warned this month in an internal memo that an American-financed poppy eradication program aimed at curtailing Afghanistan's huge heroin trade had been ineffective, in part because President Hamid Karzai "has been unwilling to assert strong leadership."

A cable sent on May 13 from the United States Embassy in Kabul, the Afghan capital, said that provincial officials and village elders had impeded destruction of significant poppy acreage and that top Afghan officials, including Mr. Karzai, had done little to overcome that resistance.

"Although President Karzai has been well aware of the difficulty in trying to implement an effective ground eradication program, he has been unwilling to assert strong leadership, even in his own province of Kandahar," said the cable, which was drafted by embassy personnel involved in the anti-drug efforts, two American officials said.

A copy of the three-page cable, which was addressed to Secretary of State Condoleezza Rice, was shown to The New York Times by an American official alarmed at the slow pace of poppy eradication.

The cable also faulted Britain, which has the top responsibility for counternarcotics assistance in Afghanistan, for being "substantially responsible" for the failure to eradicate more acreage. British personnel choose where the eradication teams work, but the cable said that those areas were often not the main growing areas and that the British had been unwilling to revise targets.

The criticism of Mr. Karzai reflected mounting frustration among some American officials that plans to uproot large swaths of Afghanistan's poppy crop have produced little success. These officials said they worried that heroin trafficking could threaten the American-led reconstruction effort in Afghanistan and worsen corruption in the country's fledgling central government.

In Washington, State Department officials defended Mr. Karzai, who is scheduled to visit next week, saying the effort had been hampered by bad weather and logistical problems as well as by political resistance.

"President Karzai is a strong part-

Continued on Page 12

---

## In Exam of 126 Walls, Cracks, Bulges and Leaks

**By SEWELL CHAN and ANAHAD O'CONNOR**

A chain-link fence hems in an unusable wall that looms over West 110th Street in Manhattan, obscuring a 15-foot section that collapsed two years ago and has not yet been repaired.

At a church cemetery in Harlem, trees shoot out from the crevices of a stone retaining wall, exerting pressure on the already tilting structure. In the Bronx, a backyard is held in by a crumbling barrier that has already sent landslide-like stones tumbling onto an access road to the Major Deegan Expressway.

An examination by The New York Times of 126 privately owned retaining walls across the five boroughs, totaling more than 43,500 square yards, revealed a range of conditions, including considerable decay.

"I get up every morning to check my side wall to see what shape it's in," said John J. Buckley, who owns a Dutch colonial in Queens. "There are spots on the wall where, yes, if you stuck your hand in, you could wipe away the cement that's holding the wall together."

The perils of wall failure became apparent on May 12 with the spectacular collapse of a 75-foot-high wall onto the Henry Hudson Parkway.

number with visible decay. The city is so concerned that the Buildings Department is urging owners of retaining walls to call the 311 hotline for a free inspection and is offering temporary amnesty from citations and fines for code violations.

On Thursday, a team of 10 inspectors, architects and engineers from the Buildings Department began visiting all of the privately

Continued on Page 36



18   N                                         THE NEW YORK TIMES INTERNATIONAL SUNDAY, MAY 22, 2005

## Time Lag: Detainee Deaths and Military Investigations

**519TH MILITARY INTELLIGENCE BATTALION**

July 2002 The 519th M.I. Battalion arrives at the Bagram detention center in Afghanistan.

Jan. 2003 Interrogators from the battalion return home to Fort Bragg, N.C. The operations officer, Capt. Carolyn A. Wood, later is awarded a Bronze Star for meritorious service.

March Personnel from the battalion deploy to Iraq.

July Personnel from the battalion take over interrogations at Abu Ghraib prison under the direct leadership of Captain Wood.

**DETAINEE DEATHS**

Nov. 30–Dec. 4, 2002 Mullah Habibullah arrives at the Bagram detention center. He dies after days of beatings by guards.

Dec. 2002 Military spokesmen at Bagram say the men died from natural causes.



Dec. 5–10 A taxi driver known as Dilawar is taken into custody. He dies after being chained to the ceiling of his cell for days.

Dec. 12 Lt. Gen. Daniel K. McNeill, commander of allied forces in Afghanistan, orders an investigation that finds serious problems at the detention center.

Dec. 8–15 Initial autopsy reports show both men died violent deaths.

Dec. 31 The Army's Criminal Investigation Command conducts the last full interview of their initial inquiry into the deaths of the two men. Weeks later, they recommend that the case be closed without seeking charges against any of the soldiers.

Oct. 8 The Army's criminal investigation ends, finding probable cause to charge 27 officers and soldiers with crimes related to the deaths of Mr. Dilawar and 15 of the personnel were charged in the case of Mr. Habibullah.

**INVESTIGATIONS**

April 15, 2003 Bagram report is sent back by Criminal Investigation Command headquarters for many issues that required additional work, pursuit, clarification or scrutiny.

Aug. 6 After "a review of investigative shortcomings" by senior officials, the Criminal Investigation Command, the Bagram inquiry is assigned to the agency's headquarters.

Aug. 2004 Report into abuse at Abu Ghraib by Lt. Gen. Anthony R. Jones finds that Captain Wood installed methods at the Iraqi prison that were "remarkably similar" to those she applied in Bagram.

*The New York Times*

## Army Faltered in Investigating the Deaths of 2 Detainees in Afghanistan

*Continued From Page 1*

ods in Iraq that had overseen in Afghanistan.

Citing, "investigative shortfalls," senior Army investigators took the Bagram inquiry away from agents in Afghanistan and gave it instead to a task force based at the agency's headquarters in Virginia. In October 2004, the task force found probable cause to charge 27 of the military police guards and military intelligence interrogators with crimes ranging from involuntary manslaughter to lying to investigators. Those 27 included the seven who have actually been charged.

"I would acknowledge that a lot of these investigation appear to have taken excessively long," the Defense Department's chief spokesman, Larry Di Rita, said in an interview on Friday. "There's no other way to describe an investigation that takes two years. People are being held accountable, but it's taking too long."

Mr. Di Rita said the Pentagon was examining ways to speed up such investigations, "because justice delayed is justice denied."

A spokesman for the Criminal Investigation Command, Christopher Grey, would not discuss details of the case, but played down the significance of the agents' early proposal to close it. He said he could not disclose the reasons for the agents' recommendations rather than speed, and that it was eventually reduced more than 20 interviews the world.

"Case agents make recommendations all the time," Mr. Grey said. "But the investigative process looks at investigations constantly

Two Afghan detainees died from their injuries in December 2002 after being shackled and beaten at the American military base in Bagram, Afghanistan, above.

Second of two articles. The first article, produced by bloggers, and made by Tim Golden, are online at nytimes.com/world

## Officers debated Red Cross complaints days before detainees died.



President Hamid Karzai of Afghanistan.

## Karzai Demands Custody of Detainees in Afghanistan

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Yousif Abdullah Al-Rubaish, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | Civil No.  05-cv-1714-RWR |
| v. | ) | |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## [DRAFT] ORDER

**AND NOW**, this _____ day of _____, 2005, upon consideration

of Petitioners' Motion for Preservation Order and any opposition and replies thereto, it is hereby

**ORDERED** that Petitioners' Motion is **GRANTED**.  It is further

**ORDERED** that Respondents shall **PRESERVE** and **MAINTAIN** all evidence,

documents, and information, without limitation, now or ever in Respondents' possession,

custody or control, regarding Petitioner Al-Rubaish.


Dated: _____          BY THE COURT:


                                    _____
                                    RICHARD W. ROBERTS
                                    United States District Judge